# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

Assigned on Briefs October 4, 2011

## STATE OF TENNESSEE v. COURTNEY BISHOP

**Appeal from the Criminal Court for Shelby County**
**No. 08-07886      James M. Lammey, Jr., Judge**

**No. W2010-01207-CCA-R3-CD  - Filed March 14, 2012**

The defendant, Courtney Bishop, appeals his Shelby County Criminal Court jury convictions for felony murder and attempted aggravated robbery, challenging the sufficiency of the convicting evidence and the trial court's refusal to suppress his pretrial statement to police. Because the trial court erred by failing to suppress the defendant's statement, the defendant is entitled to a new trial. Because the evidence was insufficient to support the defendant's convictions for attempted aggravated robbery and first degree murder in the perpetration of attempted aggravated robbery, those convictions are reversed. The conviction for attempted aggravated robbery is dismissed. The conviction for first degree murder is modified to one for second degree murder. Accordingly, the case is remanded for a new trial on the modified charge of second degree murder.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Reversed and Dismissed in Part; Reversed and Modified in Part; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

R. Todd Mosley (on appeal); and Robert Parris (at trial), Memphis, Tennessee, for the appellant, Courtney Bishop.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Kevin Rardin and Stacy McEndree, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The defendant's convictions relate to the shooting death of the victim, Maurice

Taylor, Jr., on August 19, 2008. At trial, the victim's brother, Mareo Taylor, testified that at the time of the victim's death, the two men lived at 1548 Cella Street. Mr. Taylor was working as an automotive manager at Walmart, and the victim had recently been discharged from the military. The victim worked part-time in the family's concession business but was unable to make ends meet. As a result of his financial difficulties, the victim turned to selling marijuana.

At approximately 9:30 p.m. on August 19, 2008, Marlon McKay, a childhood friend whom Mr. Taylor had not seen in several years, came to the residence to speak with the victim. Mr. Taylor said that Mr. McKay tried to sell some marijuana to the victim, but the victim refused to buy it because of the low quality of the marijuana. Following the victim's refusal, Mr. McKay left. Sometime later, the victim got a telephone call. Without saying anything to Mr. Taylor, the victim walked out the side door of the residence. Mr. Taylor heard the victim say "Mareo" followed by a gunshot. Mr. Taylor said that he grabbed his bat and walked to the side door. Outside, he saw the victim "staggering." By the time Mr. Taylor dropped the bat and walked outside, the victim had fallen to the ground. Mr. Taylor said that he couldn't see any blood, but the victim "was just gargling like bubbles." At that point, Mr. Taylor began administering CPR and asked his girlfriend to call 9-1-1. Police arrived six or seven minutes later.

Several neighbors testified that they observed a light-colored, two-door Mercury Cougar circling the block near the victim's house just before the shooting. Others reported seeing two black males flee the scene in the same car minutes later. None positively identified either man.

Memphis Police Department ("MPD") Officer Lesley Jones testified that he and four other officers were the first officers to arrive on the scene, and he took over CPR from Mr. Taylor's girlfriend. They continued to perform CPR until the fire department arrived even though, in his opinion, the victim was already dead. Officers performed a basic search but discovered no weapons or money in the area near the victim.

Susan Acerra, a death investigator with the Shelby County Medical Examiner's Office, responded to the scene after being paged by MPD. She photographed the scene and conducted a brief examination of the victim's body, observing a single gunshot wound to his chest. Ms. Acerra inventoried the victim's personal belongings, which included a cellular telephone, a tube of chap stick, a lighter, and $1,163.75 in cash.

Shelby County Medical Examiner Marco Ross testified that the victim suffered a single gunshot wound that entered "the left side of the front of the chest," "perforated the left sixth costal sternal junction," and then traveled through the heart, the diaphragm, the

liver, and the right lung before coming to rest inside his lower right flank. Toxicology testing revealed the presence of marijuana and codeine in the victim's blood.

Tracy Taylor testified that at the time of the murder, she was living with Mr. McKay, who supported himself by dealing drugs and, as a result, often carried a gun. On August 19, 2008, Mr. McKay left in her 1997 Mercury Cougar at 8:30 p.m. She knew the defendant as an associate of Mr. McKay but did not know whether he accompanied Mr. McKay on August 19, 2008.

After initially denying any involvement in the victim's murder, the defendant eventually admitted his role to MPD Lieutenant Eddie Bass on August 23, 2008, telling Lieutenant Bass that "he didn't mean to do what he had done." The defendant then described "in[] detail" the scheme that Mr. McKay devised "to go and rob the victim." Mr. McKay drove them in Mr. McKay's girlfriend's Mercury Cougar to the victim's residence "to rob him for his money." The defendant told officers that Mr. McKay provided him with "[a] chrome forty-four revolver" and lured the victim out of his house by telling him that they wanted to buy marijuana from him. The defendant described the encounter that followed: "I was standing on the side of his car, I pulled a gun out, and he seen to me - he seen to me pull it out, and he tusslin' with me. He made my finger slip and pull the trigger making the gun go off, and we ran to the car, and I gave the gun back to Marlon." The defendant said that they did not take anything from the victim.

MPD Lieutenant Bart Ragland testified that on August 27, 2008, officers searched the area where they believed the defendant discarded the gun but found nothing. They later discovered the weapon outside an Applebee's restaurant "stuck down in the bushes in a purple Crown Royal bag." He described the weapon as a "Taurus forty-four magnum, five-shot revolver."

Tennessee Bureau of Investigation Forensic Scientist Cervinia Braswell testified that the bullet taken from the victim's body was fired from the weapon recovered by Lieutenant Ragland. Agent Braswell noted that the weapon contained an internal safety mechanism to prevent accidental firing. She explained:

> The transfer bar is that piece of metal that sits in between the hammer and the firing pin. When the gun is at rest, there is a gap between the hammer . . . and the firing pin. . . . I can hit it back here all day, and it's not going to go off. That piece of metal has to move up in between the hammer and the firing pin for the gun to fire.

-3-

The way that does that is when the hammer is cocked back, that piece of metal moves upwards. . . . And a feature of this safety is if I were to hit that trigger - not pull it, just knock it, the hammer would fall, but that transfer bar would fall out of the way and would keep the gun from firing. So, if I accidentally hit the trigger, the gun is not going to fire.

She said that the safety features were working on the gun at the time of her testing. The weapon "in single action" took four pounds of pressure to fire and "[i]n double action" took 12 pounds and 7/8 of an ounce. The amount of pressure to fire the gun in single action was approximately the same as that to squeeze the trigger "on a Windex bottle."

Following Agent Braswell's testimony, the State rested, and the defendant took the stand on his own behalf.

The defendant admitted that he accompanied Mr. McKay to rob the victim and that he killed the victim but claimed that he did not mean to do so. He explained that Mr. McKay, ten years his senior, came to him on August 19, 2008, and told him that he had "a little lick" for him. The defendant agreed to go, explaining, "He was telling me that [the victim] was soft, everybody had been taking from him, so it would be sweet - everybody take, so I'm thinkin' we gonna just strong-arm take his money." The defendant claimed that he "didn't really want to" participate in the robbery but did so only because Mr. McKay "was just bugging" him about it. He said he felt threatened at the time because Mr. McKay had the gun in his lap.

The pair drove the silver Mercury Cougar to Cella Street, circled the block several times, and then parked the car near an abandoned house located across the street from the victim's residence. They went inside the house, where Mr. McKay "put on his bandana and gloves and handed [the defendant] a gun." The defendant testified that Mr. McKay claimed the gun was "for safety" and assured him that they were going "to strong arm." Mr. McKay then told the defendant to "go on" and that he would follow in "a split second." The defendant said that he was "in fear" as he walked toward the victim's darkened yard, saying that he was "fixin' to walk off" when the victim came out of the house. He claimed that he would have continued to walk away, but the victim "stepped up" to him and grabbed him. He said that when he "yanked away" from the victim, his "finger slipped on the trigger and shot him."

After the gun went off, the defendant ran back to the car, and Mr. McKay drove off. He said that Mr. McKay complained because they hadn't gotten any money from the victim. Mr. McKay let him out of the car, and he went home. He said that he gave the gun

-4-

to Mr. McKay. Following the shooting, Mr. McKay visited him several times and told him, "Don't say nothin' to nobody."

During cross-examination, the defendant said that he had never committed a robbery and that a "strong-arm" robbery meant taking property "[u]sing your bare hands." He acknowledged that Mr. McKay did not force him to participate and never threatened him with the gun. He also acknowledged that he never made any attempt to abandon the robbery. The defendant said that he never considered summoning help for the victim because he "was just trying to get away."

Based on the evidence presented, the jury convicted the defendant as charged of first degree murder in the perpetration of an attempted aggravated robbery and of attempted aggravated robbery. The trial court imposed a sentence of life with the possibility of parole for the first degree murder conviction and a sentence of three years for the attempted aggravated robbery conviction. Finding that the defendant was a dangerous offender, the trial court ordered the sentences to be served consecutively.

In this appeal, the defendant challenges the trial court's denial of his motion to suppress his pretrial statement to police and the sufficiency of the convicting evidence. We consider each claim in turn.

*I. Motion to Suppress*

The defendant contends that the trial court erred by denying his motion to suppress the statement he provided to police following his arrest. He asserts that he was arrested without probable cause and that his statement should have been suppressed as the poisoned fruit of that illegal arrest. The State contends that police had probable cause to arrest the defendant.

At the suppression hearing, Lieutenant Ronald Collins, who participated in the investigation of the victim's murder, testified that on August 22, 2008, he was instructed to go to the defendant's home and bring him to the homicide office for questioning. At that point, the lieutenant had "received information from some other investigators that w[ere] actually handling the case. They had told us that they had taken a statement from Mr. McKay, and Mr. McKay had told them that Mr. Bishop was the one that shot and killed the victim." Lieutenant Collins conceded that the defendant was placed under arrest at 5:25 p.m. on August 22, 2008, when officers went to his house to pick him up. The lieutenant accompanied uniformed officers, who drove to the defendant's home, placed him in handcuffs, and drove him in the back of a patrol car to the criminal justice center. There, the defendant was placed in an interview room and advised of his rights. During the initial

interview, the defendant denied any knowledge of the murder. At that point, Lieutenant Collins "left the room and placed [the defendant] in the lower level on a forty-eight-hour hold." Lieutenant Collins explained the 48-hour-hold: "He's booked in jail on first-degree murder. We fill out the form to hold him in there until we can do our additional investigation to come up with the appropriate charges."

On the following day, officers brought the defendant back into the homicide office, where he was again advised of his rights. The defendant then provided a statement to the officers implicating himself in the victim's murder. Following this admission, the officers took a "formal statement," which Lieutenant Collins described as "more in depth than the actual interview itself." The defendant did not appear to be under the influence during the interview. Lieutenant Collins said that he then released the defendant "without charge on the first-degree murder" but continued to "hold" the defendant until he was "officially charged out."

Sergeant Joe Stark, who was not originally assigned to the case but filled in to take witness statements, took a written statement from Mr. McKay wherein Mr. McKay implicated the defendant. Mr. McKay later identified the defendant from a photo array. Officers then sent two members "from the other team" to "pick up" the defendant and bring him in for questioning. Sergeant Stark insisted that the defendant was not under arrest but conceded that the defendant was not free to leave. The defendant was "placed on a forty-eight-hour hold," which, according to Sergeant Stark, meant that the defendant would have been released following the passage of 48 hours if officers found no "corroborating evidence to substantiate what the codefendant had stated." He acknowledged that the officers did not have enough to charge the defendant with the victim's murder and explained the procedure for placing a suspect on a 48-hour hold, "We have to fill out an arrest ticket for the booking purpose. Then we fill out a forty-eight-hour hold affidavit which states that he's being not charged, but he is being placed on a forty-eight-hour hold." He said the purpose of the hold was to give officers "more time to either find evidence that he did it or find evidence he wasn't there and didn't do it."

Sergeant Stark said that officers made no attempt to corroborate Mr. McKay's statement before placing the defendant in custody, claiming that Mr. McKay's statement alone provided "probable cause to go find" the defendant. Sergeant Stark quibbled about the "definition of arrest," insisting that the defendant was not under arrest but was not free to leave because "[h]e was going to be placed in the jail and placed on a forty-eight-hour hold until we could corroborate the statement." He said that, as far as he was aware, at the time of the defendant's arrest, nothing other than Mr. McKay's statement implicated the defendant and nothing corroborated Mr. McKay's statement.

The defendant testified that when the officers arrived to take him into custody, he was "full of pills" and "smoking weed." He claimed that he had pills in his pocket that remained in his pocket as he stayed in jail overnight because the officers failed to search him. He said he took the two pills before being brought in for questioning the second day. The defendant acknowledged that he had been arrested before and that he waived his rights and agreed to talk to the officers on the second day.

Lieutenant Bart Ragland testified that he coordinated the investigation into the victim's death. After determining that the last call to the victim's cellular telephone came from Mr. McKay and that Mr. McKay's girlfriend's vehicle matched the description of the vehicle seen leaving the murder scene, officers arrested Mr. McKay. During his initial interview, Mr. McKay admitted that he had seen the victim earlier in the day on August 19, 2008, and that the two had made plans for a large drug transaction the following day. Mr. McKay denied being at the victim's residence at the time of the crime and denied any participation in the murder. Officers then received "cell tower information" that showed that the cellular telephone possessed by Mr. McKay "was being used in the location of the homicide." When confronted with that information, Mr. McKay admitted that he and the defendant went to the victim's home intent on robbing him but claimed that he remained uncertain about the robbery because the victim was his friend. Mr. McKay told officers that it was the defendant who approached the victim with the loaded handgun, the defendant who shot the victim, and the defendant who discarded the weapon as they fled the scene.

Following Mr. McKay's providing the statement implicating the defendant, officers located the defendant and placed him in custody. Lieutenant Ragland maintained that the defendant was not under arrest but "was put on a forty-eight-hour hold for investigation." He said that officers presented the "hold form" to a magistrate, who determined that they had "'enough to hold him on probable cause.'"[1] That finding occurred after the defendant was "picked up" but before he gave his statement on August 23, 2008. Nevertheless, Lieutenant Ragland admitted that at the time the defendant was placed in custody, officers did not have "enough to charge him with a crime," claiming they possessed probable cause to believe a crime had been committed and reasonable suspicion that the defendant "was involved."

Lieutenant Ragland, who was not on duty at the time Mr. McKay gave his statement or at the time the defendant was arrested, said that other information established that two people were present at the scene. He said that Mr. Taylor's statement corroborated Mr. McKay's statement that he had been to the victim's house earlier in the day.

---

[1]The record does not establish that the magistrate's passing on the 48-hour hold form was a true judicial determination of probable cause.

-7-

During cross-examination, Lieutenant Ragland admitted that Mr. McKay provided a large amount of false information in his first statement and some false information in his second statement. He also conceded that the only information linking the defendant to the crime was Mr. McKay's statement. Lieutenant Ragland described the "hold form" as "a very abbreviated form which basically says that we have reason to believe that a person is involved in this crime; that we'll need additional time to investigate it to either corroborate alibis or dispel them."

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). We review the issue in the present appeal with these standards in mind.

Both the state and federal constitutions offer protection from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see also State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997). Thus, a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure.

First, we must determine the nature of the law enforcement encounter. Our supreme court has recognized three distinct types of police-citizen interactions: "(1) a full scale arrest [which must be] supported by probable cause; (2) a brief investigatory detention [which must be, at least,] supported by reasonable suspicion; and (3) a brief police-citizen encounter, which requires no objective justification." *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000) (citations omitted). To determine if an interaction between an officer and an

-8-

individual is a seizure or a consensual encounter, the court must consider all the surrounding circumstances and ascertain whether the "police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991).

The facts of this case establish beyond any shadow of a doubt that the defendant was seized; indeed, the record establishes that, despite the officers' insistence that the defendant was merely to be held for 48 hours, the seizure in this case was a full-scale arrest. The defendant was taken from his home in handcuffs, transported to the jail, and handcuffed to a bench before being interrogated by officers. The officers candidly admitted that the defendant was not free to leave, and he was booked into the jail that very evening. The officers apparently believed that the defendant could be placed on a "48-hour hold" in the absence of probable cause and that, because the defendant was not yet charged with any crime, such procedure was constitutionally permissible. That the officers held such a belief is troubling given that this court has repeatedly noted the illegality of the procedure and warned the Memphis Police Department specifically against its use. *See, e.g.*, *State v. Kalvin Rush*, No. W2005-02809-CCA-R3-CD, slip op. at 2 n. 2 (Tenn. Crim. App., Jackson, Oct. 11, 2006) ("This Memphis Police Department practice has been routinely condemned as it constitutes an unlawful detention and subjects any evidence obtained during this period of detention to suppression."); *State v. Larico S. Ficklin*, No. W2000-01534-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Jackson, Aug. 27, 2001) ("The officers apparently, and mistakenly, believed it was permissible to take a person into custody without probable cause for questioning since there is no 'arrest.'"); *see also, e.g.*, *State v. Lawrence*, 154 S.W.3d 71, 78 (Tenn. 2005) (finding no error in detention only because it was supported by probable cause); *State v. Dean*, 76 S.W.3d 352, 362 (Tenn. Crim. App. 2001) (same). More troubling still is the fact that the procedure utilized in this case does not appear to be based solely upon the constitutional misunderstandings of the individual officers in this case but upon an approved departmental policy, as evidenced by the fact that the department has created a form specifically for the "48-hour hold." Unfortunately, it appears, at least in this case, that the magistrate gave an air of legitimacy to the procedure by agreeing to pass on the "48-hour hold" form submitted by the police without making an official finding of probable cause. The prosecutors, at least in this case, appeared to believe that the "48-hour" hold was less than an arrest and, therefore, required a lesser level of cause than that required for a full-scale arrest. The prosecutor in this case attempted to distinguish probable cause to "bring them in and talk to them and hold them and investigate" and probable cause to "get charged." The trial court observed that "the whole purpose" of the 48-hour hold was so "it doesn't become an abusive situation" and deemed the procedure "not unreasonable under the circumstances." To understand how this view came be held, we will conduct a brief review of what we believe to be the genesis of the "48-hour hold" procedure utilized in this case.

In *Gerstein v. Pugh*, 420 U.S. 103 (1975), the Supreme Court held that "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest," *id.* at 114, and that "this determination must be made by a judicial officer either before or promptly after arrest," *id.* at 125. Sixteen years later, the Court concluded that "it is not enough to say that probable cause determinations must be 'prompt.' This vague standard simply has not provided sufficient guidance." *County of Riverside v. McLaughlin*, 500 U.S. 44, 55-56 (1991). The Court ruled "that a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *Id.* at 56. The Court held that delays in excess of 48 hours will require more scrutiny:

> Where an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance. The fact that in a particular case it may take longer than 48 hours to consolidate pretrial proceedings does not qualify as an extraordinary circumstance. Nor, for that matter, do intervening weekends. . . .

*Id.* at 57.

Not all probable cause determinations pass constitutional muster, even those provided within 48 hours of an accused's warrantless arrest. *McLaughlin*, 500 U.S. at 56. The Court has noted that a *Gerstein* violation can be established "if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays *for the purpose of gathering additional evidence to justify the arrest*, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id.* (emphasis added); *see also State v. Huddleston*, 924 S.W.2d 666, 676 (Tenn. 1996). The Court also condemned the use of arrest as an investigatory tool in *Brown v. Illinois*, 422 U.S. 590 (1975), deeming Brown's arrest, which was unsupported by probable cause and was "both in design and in execution . . . investigatory," illegal and improper. *Brown v. Illinois*, 422 U.S. 590, 605 (1975). This court has similarly excoriated the use of a detention "for the purpose of gathering additional evidence." *State v. Mitchell Delashmitt*, No. E2007-00399-CCA-R9-CD, slip op. at 18 (Tenn. Crim. App., Knoxville, Aug. 7, 2008).

It appears that the MPD has created a procedure to do that very thing prohibited by the state and federal constitutions: detain a suspect as an investigative tool specifically

designed to acquire additional evidence to support the detention. The cases underscore the principle that the 48-hour rule was designed to provide a limitation on police power and not an invitation to police to violate constitutional rights. To state the matter more succinctly, anytime a person is taken into police custody and detained in the manner that occurred in this case, such detention must be supported by probable cause. The "48-hour hold" does not exist in our constitutional pantheon of acceptable practices. The 48-hour hold procedure as described and utilized in this case is patently unconstitutional and subjects any evidence acquired to suppression. No matter how objectively reasonable a particular procedure or the nomenclature applied to it may seem, the fact remains that the seizure in this case was an arrest that must have been supported by probable cause. Accordingly, we must determine whether the defendant's arrest was supported by probable cause.

"Probable cause in the context of a warrantless arrest 'exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are "sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense."'" *State v. Lewis*, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000) (quoting *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964))). The defendant's arrest was predicated upon Mr. McKay's statement that he and the defendant had gone to rob the victim and that the defendant had shot the victim.[2] The trial court, in determining whether Mr. McKay's statement provided probable cause to arrest the defendant, treated Mr. McKay as a criminal informant. In our view, this was the correct analytical framework for examining Mr. McKay's statement.

If a warrantless arrest is based "in part on information from an informant from the criminal milieu, [the officers] must be able to demonstrate that the informant (1) has a basis of knowledge and (2) is credible or his information is reliable." *Lewis*, 36 S.W.3d at 98 (citing *Bridges*, 963 S.W.2d at 491; *State v. Jacumin*, 778 S.W.2d 430, 436 (Tenn. 1989)). Here, Mr. McKay's basis of knowledge comes from his presence during and his participation in the crime. At the conclusion of the hearing, the trial court observed that Mr. McKay's implicating himself in the plan to rob the victim "show[ed] some veracity" but nevertheless stated that it need not make a complete finding of veracity or credibility because "there's never any question as to what their veracity is so long as he's identified." In its later-filed written order, the trial court concluded that Mr. McKay's information was "credible since he

---

[2]Although Lieutenant Collins mentioned in passing that he "recall[ed]" that the defendant may have had another arrest warrant pending, the State offered no proof at the hearing that another warrant for the defendant's arrest existed at the time of his arrest or that the defendant was arrested on the basis of any such warrant. The officers' testimony clearly and unequivocally established that the defendant was arrested solely on the basis of Mr. McKay's statement.

implicates himself and his statement describes in detail the means, motive, and opportunity to commit the crime and the scene of the crime."

Although Mr. McKay did implicate himself in the initial plan to rob the victim, he denied any participation in the murder and claimed that the defendant pressed on with the robbery plan even after Mr. McKay indicated an intention to abandon it. Mr. McKay's implicating himself via an entirely self-serving and only partially inculpatory statement does little to bolster his credibility. *Cf. Williamson v. United States*, 512 U.S. 594, 599-600 (1994) ("The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature."); *People v. Campa*, 686 P.2d 634, 641 (Cal. 1984) ("[D]eclarations against penal interest may contain self-serving and unreliable information. Thus, an approach which would find a declarant's statement wholly credible solely because it incorporates an admission of criminal culpability is inadequate."); *State v. Dotson*, 254 S.W.3d 378, 393 (Tenn. 2008) ("'Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements.'" (quoting *Williamson*, 512 U.S. at 600)). Lieutenant Ragland admitted his belief that officers did not have "enough to charge [the defendant] with a crime" at the time he was arrested and instead had probable cause to believe a crime had been committed and reasonable suspicion that the defendant "was involved." He admitted that Mr. McKay's first statement to police, wherein he denied any knowledge of the crime and denied being near the victim's house when the crime occurred, was completely false and that Mr. McKay's second statement, wherein he admitted participation in the plan to rob the victim but blamed the defendant entirely for the victim's murder, contained a substantial amount of false information. In our view, Mr. McKay's statement does not, in and of itself, provide sufficient information to support a determination that he was credible or that his information regarding the defendant's participation in the crime was reliable.

That being said, independent corroboration of an informant's statement can supplement the information used to establish an informant's basis of knowledge or reliability/credibility. *See State v. Ballard*, 836 S.W.2d 560 (Tenn. 1992); *Jacumin*, 78 S.W.2d at 436. The trial court concluded that

> Much of [Mr. McKay's] statement describing a scheme for the
> sale of drugs in order to set up the victim for robbery is
> corroborated by other witnesses. In particular [Mr. McKay]
> mentions an accomplice thereby corroborating eye witness
> accounts of seeing two individuals fleeing the scene and a

-12-

witness who thought there may have been someone else in [Mr. McKay's] automobile seen in the area of the crime.

The record, however, does not clearly establish that officers were aware of information that two individuals fled the scene *at the time they arrested the defendant*. *See Jacumin*, 778 S.W.2d at 432 (probable cause determination must be made on information known at the time of the arrest). Lieutenant Collins, who arrested the defendant, testified that the defendant was arrested on the basis of "information from some other investigators" that "Mr. McKay had told them that [the defendant] was the one that shot and killed the victim." Sergeant Stark, whose "team" gave the order to arrest the defendant, conceded that he was not aware of any witness account that two people fled the murder scene. Sergeant Stark likewise acknowledged at the suppression hearing that he believed they did not have enough to charge the defendant with the victim's murder and stated they would have released him following the passage of 48 hours if they found no "corroborating evidence to substantiate what the codefendant had stated." He also testified that phone records and Mr. Taylor's statement corroborated Mr. McKay's admission that he was at the scene and that he and the victim had discussed a drug deal. Although these facts corroborated Mr. McKay's involvement, nothing corroborated Mr. McKay's statement that the defendant was involved, let alone that he was the shooter.

Because the State failed to establish that the information provided by Mr. McKay was either reliable or credible, the State likewise failed to establish that there was probable cause for the defendant's arrest. Indeed, the record clearly establishes that the officers did not believe they needed probable cause to detain the defendant under the "48-hour hold" procedure. Having concluded that the defendant's warrantless arrest was illegal, we turn to the question whether his statement should be suppressed as the poisonous fruit of his illegal arrest.

The trial court found that the defendant's statement was voluntarily given, noting that he had been advised of his constitutional rights and had signed a written waiver of those rights prior to giving his statement. As the Supreme Court has observed, however,

> 'the fact that [a] confession may be 'voluntary' for purposes of the Fifth Amendment, in the sense that *Miranda* warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest. In this situation, a finding of 'voluntariness' for purposes of the Fifth Amendment is merely a threshold requirement for Fourth Amendment analysis.'

*Lanier v. South Carolina*, 474 U.S. 25, 26 (1985) (quoting *Taylor v. Alabama*, 457 U.S. 687,

-13-

690 (1982)); *see also Dunaway v. New York*, 442 U.S. 200, 217-18 (1979); *Brown*, 422 U.S. at 602. In *Huddleston*, our supreme court emphasized that "[t]he voluntariness test is not the proper vehicle for analyzing whether a Fourth Amendment violation requires suppression of a statement" because that test "is designed to protect the Fifth Amendment right against self-incrimination by excluding a statement that is obtained as a result of coercion by law enforcement officials" and "does not address the interests implicated by a Fourth Amendment violation." *Huddleston*, 924 S.W.2d at 673-74. Instead, the State must establish not only "that the statement meet[s] the Fifth Amendment standard of voluntariness but that it [is] sufficiently an act of free will to purge the primary taint" of the Fourth Amendment violation. *Id.* at 674; *see also Brown*, 422 U.S. at 599 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)) (holding that when considering whether a statement obtained in violation of the Fourth Amendment must be suppressed, the question is "whether [the statement] 'was sufficiently an act of free will to purge the primary taint of the unlawful invasion.'").

In *Brown*, the Supreme Court listed several factors to be considered when determining whether a statement obtained following an illegal arrest should be suppressed. *Brown*, 422 U.S. at 603-04. The Court emphasized that no single factor is determinative; instead, examination of several factors is necessary to determine if the confession was an act of the accused's free will:

> The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution.

*Id.* (citations omitted). Here, the defendant provided an inculpatory statement on the afternoon following his illegal arrest, after he had spent the night in jail on the first part of his "48-hour hold." Although he was provided *Miranda* warnings, no intervening circumstances such as a consultation with counsel or a telephone call with his parents occurred.

The factor entitled to greatest weight in this case is the purpose and flagrancy of the official misconduct. The officers admitted seizing the defendant with less than probable cause because they believed it permissible to do so as long as they did not detain him longer than 48 hours. The rankly unconstitutional 48-hour hold utilized in this case is

-14-

the product of a police department policy, a policy condemned by this court repeatedly in the past. As was the case in *Brown*, the purpose of the detention in this case was investigatory. "Detentions may be 'investigative' yet violative of the Fourth Amendment absent probable cause." *Florida v. Royer*, 460 U.S. 491, 499 (1983). "In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. Nor may the police seek to verify their suspicions by means that approach the conditions of arrest." *Id.* The Supreme Court made this point clear in *Dunaway v. New York*, 442 U.S. 200 (1979), declaring, "Detention for custodial interrogation–regardless of its label–intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Dunaway v. New York*, 442 U.S. 200, 211-12 (1979). Our own supreme court has observed that "incarceration for any period of time is inherently coercive." *Huddleston*, 924 S.W.2d at 670. This court dealt with a situation similar to that presented here in *Larico S. Ficklin*; Ficklin "was illegally seized without probable cause and illegally detained in order for the authorities to endeavor to establish probable cause for an arrest." *Larico S. Ficklin*, slip op. at 11. We observed that "[a]lthough it appears the authorities subjectively believed there was no impropriety in the seizure and continued detention, this hardly mitigates the flagrancy of these violations." *Id.*

Based upon the temporal proximity of the illegal detention and the defendant's statement, the lack of any intervening factors to mitigate the taint of the illegal arrest, and the flagrancy and purpose of the officers' illegal conduct in this case, we conclude that the trial court erred by failing to suppress the defendant's statement.

Further, the admission of the defendant's statement was not harmless. The only proof offered by the State establishing the defendant's guilt of the victim's murder came from the defendant's statement. Other than the defendant's statement, the State offered no proof that the defendant was even at the scene of the crime, let alone the person that fired the fatal shot. Moreover, although the defendant's trial testimony established his culpability for the victim's death, we cannot say that the testimony was not itself, at least in some measure, the product of the illegal arrest in this case. Without the defendant's statement, the State had no case, and there would have been nothing for the defendant to explain via his testimony at trial. Because the defendant's statement was the linchpin of the State's entire case, we cannot say "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *See Chapman v. California*, 386 U.S. 18, 24 (1967). Accordingly, the defendant is entitled to a new trial.

## II. Sufficiency

The defendant also challenges the sufficiency of the convicting evidence. We

review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003).  "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655.  Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

First degree murder, as charged in this case, is "[a] killing of another committed in the . . . attempt to perpetrate any . . . robbery."  T.C.A. § 39-13-202(a)(2). "Aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or . . . [w]here the victim suffers serious bodily injury." *Id.* § 39-13-402(a).

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a).

From our review of the evidence adduced at trial, we perceive a substantial issue concerning the sufficiency of the evidence to support the defendant's convictions of first degree murder committed in the perpetration of an attempted aggravated robbery and attempted aggravated robbery in that the defendant's testimony alone provides the only evidence that the defendant's purpose in going to the victim's residence was to rob him. To be sure, "a conviction cannot be based solely on a defendant's confession and, therefore, . . . the State must present some corroborating evidence to establish the corpus delicti." *See State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000)). The term corpus delicti refers to "the body of the crime [or] evidence that a crime was committed at the place alleged in the indictment," and the State needs "only slight evidence of the corpus delicti . . . to corroborate a confession and sustain a conviction." *Smith*, 24 S.W.3d at 281. When a defendant confesses to a crime, the corroborating evidence "'need not be as convincing as the evidence necessary to establish a corpus delicti in the absence of any confession.'" *State v. Housler*, 193 S.W.3d 476, 490 (Tenn. 2006) (quoting *Ricketts v. State,* 241 S.W.2d 604, 606 (Tenn. 1951)).

In this case, the State presented evidence that Mr. McKay came to the victim's residence on the day of the murder inquiring about selling marijuana to the victim. Sometime later, the victim received a telephone call and left the residence he shared with Mr. Taylor. Just after stepping outside, the victim was shot. Witnesses saw a light-colored Mercury Cougar circling the block in the hours before the victim's death and then saw two black males flee the scene in the same car. Ms. Taylor testified that the car belonged to her and that on the night of the murder it was being driven by her boyfriend, Mr. McKay. Although the defendant conceded at trial that he shot the victim after going to the victim's residence with the intent to rob him, this statement, like the one provided prior to trial, qualifies as a confession that cannot, standing alone, support a finding that a robbery was attempted. *See State v. Hill*, 333 S.W.3d 106, 134 (Tenn. Crim. App. 2010) (citing *Helton v. State*, 547 S.W.2d 564, 567 (Tenn. 1977) (explaining that "a confession is a statement by the accused that he engaged in conduct which constitutes a crime. . . . an acknowledg[]ment of guilt itself") (citation and internal quotation marks omitted)). Proof that the victim was shot with the same caliber weapon the defendant admitted using and that two black males were seen fleeing just after the murder corroborates the defendant's admission that he shot the victim. Nothing, however, corroborates his admission that he and Mr. McKay went to the victim's residence to rob him. As such, we conclude that the evidence was insufficient to support the defendant's conviction for attempted aggravated robbery. Because the evidence was insufficient to support the conviction for the predicate felony, the evidence is ipso facto insufficient to support the defendant's conviction for first degree murder

-17-

committed in the perpetration of an attempted aggravated robbery.

That being said, the evidence presented at trial was sufficient to establish that the defendant knowingly killed the victim. *See State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981) (holding that even inadmissible evidence goes into a calculation of the sufficiency of the evidence). The defendant admitted he approached the unarmed victim with a loaded revolver and that he shot the victim, and forensic evidence confirmed that the victim was killed with a .44 revolver. Although the defendant claimed he did not intend to shoot the victim and that the gun accidentally fired as the two men struggled, the jury was free to reject the defendant's explanation of the offense. Therefore, we reverse the defendant's conviction for first degree murder and modify it to one for second degree murder, subject to the new trial as adjudicated above.

*Conclusion*

The trial court's failure to suppress the defendant's statement, which was the product of his illegal arrest, cannot be deemed harmless error, thus the defendant is entitled to a new trial. Having concluded that the evidence was insufficient to support the defendant's convictions of first degree murder in the perpetration of an attempted aggravated robbery and attempted aggravated robbery, we reverse those convictions. Further, we dismiss the defendant's conviction for attempted aggravated robbery. The defendant's conviction for first degree murder is modified to a conviction for second degree murder. Accordingly, the defendant's new trial will be one for second degree murder.

_____
JAMES CURWOOD WITT, JR., JUDGE